IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| BRIAN SMITH,<br><br>       *Plaintiff*,<br><br>v.<br><br>LM GENERAL INSURANCE COMPANY,<br><br>       *Defendant*. | CIVIL ACTION<br>NO. 17-02310 |

**PAPPERT, J.**                                                                                              March 6, 2018

## MEMORANDUM

Brian Smith was injured in a car accident on April 7, 2015. He sued LM General Insurance Company in the Philadelphia County Court of Common Pleas on May 1, 2017 alleging breach of contract (Count I) and violations of Pennsylvania's bad faith statute, 42 Pa. C.S.A. § 8371 (Count II) in the handling of his claim for underinsured motorist benefits. (Compl., ECF No. 1.) LM General removed the case to federal court (Notice of Removal, ECF No. 1) and filed a Motion for Summary Judgment on Count II (Mot., ECF No. 22). The Court grants the Motion for the reasons that follow.

I[1]

A

Smith injured his left elbow on March 15, 2015 in a fall at his home. (Mot. ¶ 12; Resp. ¶ 12.) Three weeks later he was involved in the car accident for which he now seeks UIM benefits; Patricia Quinter ran a red light and hit Smith's car. (Mot. ¶ 1; Resp. ¶ 1.) Smith alleges that he suffered serious injuries to his elbow as a result of the

---

[1]      LM General filed an 8-page statement of undisputed material facts in accordance with the Court's Policies and Procedures. In his Opposition, Smith failed to specifically respond to the facts with citations to the record as required by those Policies and Procedures.

1

collision. (Compl. ¶ 8.) LM General does not dispute that Smith was not responsible for the accident. (Mot. ¶ 17; Resp. ¶ 17.) Smith recovered $100,000 from Quinter's insurance company. (Mot. ¶ 3; Resp. ¶ 3.) At the time of the accident, Smith was insured through LM General under a policy that provides up to $200,000 in UIM benefits, subject to the terms, conditions, limitations, and exclusions of the policy. (Mot. ¶ 5; Resp. ¶ 5.) On December 1, 2015, Smith's counsel sent a settlement proposal for UIM benefits to David Wilkins of LM General. (Resp., Ex. B.) Having not received a response, counsel sent another letter to LM General on March 11, 2016. (Resp., Ex. C.)

B

LM General wrote Smith's counsel on March 31, 2016 acknowledging receipt of his settlement proposal and informing him that Mr. Wilkins no longer works in the personal injury protection department, where counsel sent the letter. (Resp., Ex. D.) LM General also stated that the UIM claim had been forwarded to the appropriate personnel for handling. (*Id.*) Claims Resolution Specialist Linda Heist logged the UIM claim at 8:49 a.m. the next day and immediately assigned the claim to Senior Claim Resolution Specialist Jill Ordonez. (Mot., Ex. C.) Ordonez reviewed counsel's letters and spoke to him at 10:00 a.m. on April 1, 2016. (Mot., Ex. E.) During that conversation, counsel told Ordonez that he had put the case on the "back burner" because Smith was still being treated (Reply, Ex. N). Counsel also agreed to a 30-day extension for LM General to respond to Smith's initial demand. (*Id.*) Ordonez sent a follow-up letter confirming the substance of their conversation. (Mot., Ex. H-4.) In this April 1 letter, Ordonez asked counsel to have Smith complete a proof of claim form,

necessary authorizations, and provide medical records pertaining to Smith's injuries and treatment received after August 2015.  (*Id.*)  Ordonez also asked for the names of the doctors and hospitals with whom and where Smith treated for his March 15, 2015 elbow injury.  (*Id.*)

On April 25, 2016, counsel sent Ordonez the proof of claim form along with supplemental witness statements, wage and salary verification and updated medical records.  (Resp., Ex. E.)  He also told Ordonez that Smith was treated at Pottstown Memorial Medical Center and Brandywine Institute of Orthopedics for the March 2015 elbow fracture and attached the updated records from Brandywine.  (*Id.*)  Ordonez responded four days later thanking him, informing him that she requested the complete records from Pottstown and Brandywine and asking that he continue to send any additional medical records as he receives them.  (Mot., Ex. H-6.)  Counsel subsequently provided LM General with medical records from Apex Physical Therapy, Brandywine, and Pottstown on September 8, 2016.  (Mot., Ex. H-7.)

On December 1, 2016, counsel told Ordonez that Smith's elbow surgery was scheduled for December 29 and that he would send LM General the report on the operation.  (Mot., Ex. H-8.)  Ordonez sought more information on December 13, 2016, noting that the last medical records she had were from August 30, 2016.  (Mot., Ex. H-9.)  She also asked that the most updated lien information be sent after the surgery.  (*Id.*)  On January 12, 2017, counsel sent pictures of Smith's elbow after the replacement surgery (Resp., Ex. F) and on January 26 forwarded the surgical procedure report and transcript of Smith's deposition (Mot., Ex. H-11).  In Ordonez's January 30 response, she acknowledged receipt of the surgical report but once again asked for the medical

3

records between August 2016 and the date of Smith's surgery. (Mot., Ex. H-12.) Ordonez again asked for an updated lien. (*Id.*)

Ordonez told counsel in her February 6, 2017 letter that she had requested the MRI and x-rays from Patient First[2] and Pottstown Memorial. (Mot., Ex. H-13.) She also told him that she would have the records reviewed once received to determine if the car accident caused any additional damage to Smith's previously injured elbow. (*Id.*) Ordonez provided counsel another update on February 17 and informed him that once she received the requested films, they would be reviewed and she would be able to discuss a resolution to Smith's claim. (Mot., Ex. H-14.) Ten days later, counsel inquired again about the status of the claim and Ordonez informed him that she was still waiting for the films from Pottstown and Patient First. (Mot., Ex. H-15.)

In his March 27, 2017 letter, counsel warned Ordonez that he would file a lawsuit if Smith didn't receive the entire $200,000 in UIM benefits by April 7. (Resp., Ex. H.) Ordonez responded that same day and reiterated that she was still waiting to review the films from Pottstown and Patient First. (Mot., Ex. H-18.) Ordonez also told counsel that Patient First requested Smith's mailing information, which she provided. (*Id.*) Finally, she again explained that once she received the films she would have them reviewed and respond to the UIM demand. (*Id.*) Linda Heist emailed counsel on April 26, 2017, providing him a status update and also telling him that she would now be handling the claim going forward. (Resp., Ex. I.) Heist told him that LM General had received the films from Pottstown but was still waiting for films from Patient First and

---

[2] The parties refer to this entity as Patient First and Patient Care; the Court will call it Patient First throughout.

4

that she had called Patient First to check the status. (*Id.*)  Counsel filed this lawsuit and sent Heist a copy of the complaint on May 2.  (Mot., Ex. H-22.)

C

Dr. Donald C. Zajick, a board-certified radiologist, prepared a report dated May 12, 2017 in which he compared x-rays of Smith's left elbow from March 2015 with x-rays from June 2015 and determined that "no new fracture" occurred as a result of the April car accident.  (Mot., Ex. I.)  After reviewing Smith's medical records, surgical operative report, x-rays, MRIs and Smith's deposition, Dr. Dean Trevlyn, an orthopedic surgeon, also concluded that Smith did not sustain a new fracture to his left elbow as a result of the car accident.  (Mot., Ex. J.)  Dr. Trevlyn then conducted an independent medical examination of Smith on December 14, 2017 and came to the same conclusion.  (Mot., Ex. K.)

II

Summary judgment is proper if there is no genuine issue of material fact and if, viewing the facts in the light most favorable to the non-moving party, the moving party is entitled to judgment as a matter of law.  *Smathers v. Multi-Tool, Inc./Multi-Plastics, Inc. Emp. Health & Welfare Plan*, 298 F.3d 191, 194 (3d Cir. 2002); *see also* Fed. R. Civ. P. 56(c).  A genuine issue of material fact exists when "a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby Inc.*, 477 U.S. 242, 248 (1986).  A mere scintilla of evidence in support of the non-moving party will not suffice; there must be evidence by which a jury could reasonably find for the non-moving party.  *Id.* at 252. Summary judgment is appropriate where "the nonmoving party has failed to

5

make a sufficient showing on an essential element of her case with respect to which she has the burden of proof." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

In reviewing the record, a court "must view the facts in the light most favorable to the nonmoving party and draw all inferences in that party's favor." *Prowel v. Wise Bus. Forms*, 579 F.3d 285, 286 (3d Cir. 2009). The court may not, however, make credibility determinations or weigh the evidence in considering motions for summary judgment. *See Reeves v. Sanderson Plumbing Prods.*, 530 U.S. 133, 150 (2000); *see also Goodman v. Pa. Tpk. Comm'n*, 293 F.3d 655, 665 (3d Cir. 2002).

III

Pennsylvania's bad faith statute, 42 Pa. C.S.A. § 8371, provides in relevant part:

In an action arising under an insurance policy, if the court finds that the insurer has acted in bad faith toward the insured, the court may take all of the following actions:

(1) Award interest on the amount of the claim from the date the claim was made by the insured in an amount equal to the prime rate of interest plus 3%.

(2) Award punitive damages against the insurer.

(3) Assess court costs and attorney fees against the insurer.

42 Pa. C.S.A. § 8371.

Pennsylvania federal and state courts have defined "bad faith" as "[a] frivolous or unfounded refusal to pay proceeds of a policy." *Keefe v. Prudential Prop. & Cas. Ins. Co.*, 203 F.3d 218, 225 (3d Cir. 2000) (citing *Terletsky v. Prudential Prop. & Cas. Ins. Co.*, 649 A.2d 680, 688 (Pa. Super. Ct. 1994)); *Atiyeh* v. Nat'l Fire Ins. Co., 742 F. Supp. 2d 591, 598 (E.D. Pa. 2010). To recover on a bad faith claim, a claimant is required to show by clear and convincing evidence that: (1) the defendant insurer did not have a

6

reasonable basis for denying the policy benefits; and (2) that the insurer knew or recklessly disregarded its lack of reasonable basis when it denied the claim. *Keefe*, 203 F.3d at 225 (further citation omitted). This burden is "commensurately high because the court must view the evidence presented in light of the substantive evidentiary burden at trial." *Kosierowski v. Allstate Ins. Co.*, 51 F. Supp. 2d 583, 588 (E.D. Pa. 1999), *aff'd*, 234 F.3d 1265 (3d Cir. 2000).

Smith set forth fifteen allegations concerning LM General's purported bad faith. (Compl. ¶ 27(a)-(o).) They are conclusory, vague and duplicative but can be distilled down to four arguments: LM General acted in bad faith by delaying an investigation into the UIM claim for the first four months after Smith made a demand, by failing to "tender an undisputed portion" of benefits, by delaying investigation of the claim once LM General realized it was pending and by frivolously denying his claim. The Court addresses each in turn.

A

Smith contends that LM General acted in bad faith by delaying the examination of his claim "by not even transferring it to the UIM department as per company protocol." (*See* Compl. ¶ 27 (c), (d); Resp., at 5.) Smith's counsel sent an initial demand letter seeking UIM benefits to David Wilkins of LM General on December 1, 2015. (Resp., Ex. B.) LM General didn't learn of the letter until March and responded on March 31, 2016 that his client's claim was forwarded to the UIM claims department. (Resp. Ex. D.) After the UIM claim was assigned to Ordonez the next morning, she spoke with counsel immediately. Not only did he agree to a thirty day extension, he

7

stated that he was not pressing the matter because Smith was still being treated. (Reply, Ex. N.)

The crux of Smith's argument is that LM General acted in bad faith because Ms. Heist "candidly admitted in her…deposition that her company's delay was unjustifiable and excessive.…" (Reply, at 3.) In her deposition, Heist testified that the initial delay in processing the claim, from the time the letter was sent in December 2015 to the time LM General responded in March 2016, "could cause serious problems for LM.…" (Resp., Ex. A, Heist Dep. 37:18-23.) She explained that she meant it could create "bad faith implications." (*Id.* 39:6-9.) First, this is not an admission on LM General's behalf that it engaged in bad faith conduct. It indicates Heist's concern and warning to other LM General employees to look out for any additional delays in processing claims. Second, Heist's concern about "bad faith implications" is not determinative of anything. Whether or not LM General's actions constitute bad faith is for the Court to decide. LM General's delay in responding to counsel's initial letter was attributable to the letter's recipient no longer working there, and there is no evidence in the record which shows that not to be the case. LM General may have been negligent in not ensuring that mail sent to Mr. Wilkins was promptly forwarded to the appropriate claims representative, but that does not constitute bad faith on the part of the insurer.

"[I]f delay is attributable to…simple negligence, no bad faith has occurred." *Williams v. Hartford Cas. Ins. Co.*, 83 F. Supp. 2d 567, 572 (E.D. Pa. 2000), *aff'd*, 261 F.3d 495 (3d Cir. 2001); *see also Atiyeh*, 742 F. Supp. 2d at 598 ("Moreover, an insurer's conduct need not be fraudulent, but mere negligence or bad judgment will not suffice.").

The record shows that Smith's initial demand letter was sent to the incorrect person and got lost in the shuffle until March 2016, indicating a mistake and at most, simple negligence. *See El Bor Corp. v. Fireman's Fund Ins. Co.*, 787 F. Supp. 2d 341, 349–50 (E.D. Pa. 2011) (finding no evidence that delay was knowing or reckless where the plaintiff's claim "fell through the cracks"). Further, LM General immediately assigned Ordonez to handle the claim once Smith's letters were discovered.

B

Smith claims that LM General acted in bad faith by "failing to promptly offer reasonable payment of underinsured motorist benefits." (Compl. ¶ 27(h).) In his brief, Smith explains that LM General failed to offer "even the amount which it deemed [his] claim to be worth (as a gesture of good faith even if not required by the policy to do so)." (Resp., at 8.) Insureds may request that the insurer make a partial valuation of a claim. If the insurer does so, both the insurer and insured must agree that the amount represents an undisputed amount of benefits due. If they agree, the insurer can pay the undisputed amount of the claim. *See Williams v. Nationwide Mut. Ins. Co.*, 750 A.2d 881, 889 (Pa. Super. Ct. 2000).

Here, Smith has not pled that he requested a partial valuation of his UIM claim nor has he pled that LM General made a partial valuation. Further, there is no evidence in the record that shows that Smith and LM General agreed on an "undisputed" amount of the claim. In fact, LM General explains that it "was continuing to investigate…to properly evaluate the claim." (Reply, at 8.) The record lacks any evidence showing that LM General had ever determined a value of the minimum amount in benefits to which Smith was entitled, likely because LM General needed to

9

determine if the car accident caused *any* additional damage to Smith's elbow. (Mot., Ex. H-13.)

C

Smith next alleges that LM General acted in bad faith by "failing to investigate" and "engaging in dilatory" handling of his claim. (Compl. ¶ 27 (i), (c).) Lack of investigation into the facts or failure to communicate with an insured are actions by an insurer that can rise to the level of bad faith. *Hamm v. Allstate Prop. & Cas. Ins. Co.*, 908 F. Supp. 2d 656, 668–69 (W.D. Pa. 2012); *Corch Const. Co. v. Assurance Co. of Am.*, No 1250-C, 2003 WL 23473924 (Pa. Commw. Ct. 2003) (Bad faith may occur "when an insurance company makes an inadequate investigation or fails to perform adequate legal research concerning a coverage issue."); *see also Frog, Switch & Mfg. Co., Inc. v. Travelers Ins. Co.*, 193 F.3d 742, 751 n.9 (3d Cir. 1999). The record is replete with evidence to the contrary.

Over a span of thirteen months, LM General communicated with Smith at least eleven times. (*See infra* Section I.) In fact, LM General sought records from Smith on April 1, 2016 (Mot., Ex. H-4), April 29, 2016 (Mot., Ex. H-6), December 13, 2016 (Mot., Ex. H-9) and January 30, 2017 (Mot., Ex. H-12). Additionally, LM General provided Smith's counsel with status updates on April 29, 2016 (Mot., Ex. H-6), January 30, 2017 (Mot., Ex. H-12), February 6, 2017 (Mot., Ex. H-13), February 17, 2017 (Mot., Ex. H-14), March 27, 2017 (Mot., Ex. H-18), April 26, 2017 (Resp., Ex. I) and November 21, 2017 (Resp., Ex. J). LM General further informed counsel on five occasions that it requested medical records from Smith's providers. (Mot., Ex. H-6; Mot., Ex. H-13; Mot., Ex. H-14; Mot., Ex. H-18; Resp., Ex. I.) Not only did LM General continuously pursue its

investigation, it communicated with Smith throughout the entire process. Indeed, the record demonstrates efforts by LM General to obtain relevant information necessary to assess the UIM claim and an extensive amount of mutually cooperative communication between Smith's counsel and the insurer. Ultimately, once Heist received the complete medical records on April 26, 2017, she contacted Dr. Zajick *that same day* to schedule his review of those records. (Reply, Ex. N., at LM 0038.)

Smith argues that for a period of six months, between April 29, 2016 and November 8, 2016, LM General didn't communicate with him "in any way or form." (Resp., at 6.) The record does not support Smith's allegation. The claim log indicates that Ordonez had a "discussion about surgery" with counsel on October 26, 2016. (Reply, Ex. N, at LM 0046.) The record also makes clear why LM General did not communicate with Smith more often during those months. On April 29, 2016, Ordonez sent Smith's counsel a letter informing him that LM General requested complete medical records from Pottstown Memorial Hospital and Brandywine Orthopedics. (Mot., Ex. H-6.) Ordonez also asked counsel to "continue to provide [LM General] with [Smith's] medical records as you receive them." (*Id.*) It wasn't until September 8, 2016 that counsel forwarded additional medical records, (Mot., Ex. H-7), which were duplicative of what LM General already had (Reply, Ex. N, at LM 0047). Additionally, LM General could not make a final determination on Smith's claim during that time frame because it needed the surgical procedure report from Smith's elbow surgery which was not scheduled until December 29, 2016. Further, Smith needed the operative report in order to "send a formal demand for the policy limits." (Resp., Ex. F.)

Smith also alleges that LM General never sought updated lien information from him. (Resp., at 7.) The record shows that assertion to be patently false. On December 13, 2016 Ordonez told counsel that she would need the most updated lien information after the surgery (Mot., Ex. H-9) and on January 30, 2017 she asked for that information again because the latest lien she had in her possession was from September 2016 (Mot., Ex. H-12).

D

Smith's final allegation is that LM General acted in bad faith by "frivolously denying [his] claim." (Compl. ¶ 27(j).) "[A]n insurer may defeat a bad faith claim by showing that it conducted a review or investigation sufficiently thorough to yield a reasonable foundation for its action." *Luse v. Liberty Mut. Fire Ins. Co.*, 411 F. App'x 462, 465 (3d Cir. 2011). LM General did just that. The insurer collected numerous medical records and scans from various physicians and hospitals where Smith sought treatment for his left elbow, both as a result of the March 2015 fall and the April 2015 car accident. LM General determined after its investigation that Smith's elbow injury resulted from his March 2015 fall at home, not the car accident in early April. (Reply, at 1.) LM General relied on a report from Dr. Zajick, a board-certified radiologist, and an independent medical examination from Dr. Trevlyn, an orthopedic surgeon. After reviewing medical records and examining Smith, Dr. Trevlyn opined that Smith did not suffer any new injury to his left elbow from the car accident. Any denial of Smith's claim on this basis was based on a "reasonable foundation." *See Seidman v. Minnesota Mut. Life Ins. Co.*, 40 F. Supp. 2d 590, 594 (E.D. Pa. 1997) (holding that an insurer's

reliance on an Independent Medical Examination constitutes a reasonable basis to deny benefits).

IV

A thorough review of the record makes clear that no reasonable jury could return a verdict for Smith on his bad faith claim. Smith cannot show by clear and convincing evidence that LM General lacked a reasonable basis for not paying the UIM benefits and that LM General recklessly disregarded a lack of such a basis in not acceding to Smith's lawyer's demands for payment.

An appropriate order follows.

BY THE COURT:

***/s/ Gerald J. Pappert***
GERALD J. PAPPERT, J.